BERTHA MORSE et al., Appellees, v. FRANK T. SLOCUM et al., Appellants.

**CONTRACTS: Validity—Undue Influence.** Evidence attending the assignment of practically the entire estate of an aged and enfeebled father to his son reviewed, and held to sustain a finding by the trial court that the same was obtained by undue influence.

**GUARDIAN AND WARD: Sale by Ward Pending Guardianship.** Property in the possession of a legally appointed guardian may not be sold and assigned by the ward. Especially is the court justified in holding the contract void when both parties to the contract had full knowledge of the guardianship, and when the contract by its own terms recognized the invalidity thereof, pending the continued existence of such guardianship.

**CONTRACTS: Waiver and Substitution.** One who enters into an executory contract for the care and support of a person must be held to abandon all rights under the contract when, subsequent to the execution thereof, he enters into and executes a separate and different contract with the legally appointed guardian of such person for the same care and support.

*Appeal from Osceola District Court.*—C. C. BRADLEY, Judge.

JANUARY 10, 1922.

ACTION in equity, to set aside a certain conveyance of real estate and the assignments of certain mortgages. The trial court found for the plaintiffs, granting the relief asked, and defendants appeal. The material facts are sufficiently stated in the opinion. —*Affirmed.*

*Clark, Dwinell & Meltzer* and *L. E. Francis,* for appellants.

*T. E. Diamond,* for appellees.

WEAVER, J.—Wesley Slocum, a resident of Osceola County, died intestate, February 12, 1919, at the age of 83. He was a widower, and was survived by five children, his only heirs and next of kin: Frank Slocum, defendant herein, and the plaintiffs Bertha Morse, Hattie Heeg, Carl Slocum, and Arthur Slocum. All the children were adults, the youngest being 34 years old, all married, and having homes of their own. Until a date hereinafter named, Frank lived in Nebraska, Hattie in Illinois, Carl and Arthur in Minnesota, and Bertha a few miles from the paternal home. The wife of deceased died in 1911. After that date, the deceased, for a considerable period, lived in the homestead alone, with the assistance of more or less hired help. In July, 1915, he suffered a stroke of paralysis. He appears not to have been completely paralyzed, and was soon able to be out (though not strong), and in September visited his sons in Minnesota. While there, he complained of his failing eyesight and enfeebled condition, and spoke of having someone selected to do his business. Later, after returning to his home in Sibley, Iowa, he went to the office of the clerk of the district court, where he signed an application or petition for the appointment of one Will Thomas to be the guardian of his personal estate, and stated, as reason for such request, that, owing to his age (then 78 years) and poor health, he was unable to look after his affairs and property and properly provide for his own needs, and that, having confidence in Thomas, he desired his appointment to execute such trust. Upon this application, Thomas was appointed temporary guardian of the applicant. While the guardian gave bond and filed

1. CONTRACTS: validity: undue influence.

an inventory, there appears to have been very little actual change
in the management and control of the property, and the guard-
ianship was dissolved, and the property, so far as it was under
the actual or constructive control of Thomas, was returned to
and receipted for by the deceased on December 22, 1915. In
May, 1916, deceased sustained a second attack of paralysis. This
stroke greatly aggravated his enfeebled condition, and left him
prostrate and practically helpless during the remainder of his
life. His daughter Hattie came from Illinois and assisted in his
care for two or three months. In addition to help afforded by
his daughter, a woman housekeeper was employed; also another
person, who served as nurse, or caretaker for the sick man. In
the winter of 1916-1917, the son Frank, defendant herein, came
with his wife from their Nebraska home; and soon thereafter,
the father and son entered into an agreement, oral at first, by
which the son and son's wife would remain for a time not def-
initely fixed, and care for deceased for compensation at the rate
of $2,500 per year. Something more than a year later, in March,
1918, the agreement was put in written form, and upon the same
consideration, to continue for one year. There was some talk
between them to the effect that the old gentleman, if able, would
go to Nebraska and live with Frank there; but this was not made
a term of the agreement. On April 27, 1918, deceased was
stricken with paralysis for the third time, and continued to
suffer therefrom until his death, on February 12, 1919. On May
13, 1918, following this final stroke, three of the present plain-
tiffs, Bertha, Carl, and Arthur, instituted proceedings in the
district court by which one T. S. Redmond was duly appointed
temporary guardian of the person and estate of the deceased.
The principal items of the parent's property at that time con-
sisted of his homestead, valued at about $5,000, a promissory
note of $8,000, another of $3,000, and another of $19,400, each
secured by mortgage. There were also other minor items not
necessary to enumerate. On May 13, 1918, three days after the
appointment and qualification of the temporary guardian, it is
alleged that the deceased and the son Frank executed a written
instrument, in words following:

"This contract and agreement made and entered into in
duplicate this 16th day of May, 1918, by and between Wesley

Slocum of Sibley, Iowa, and Frank Slocum of Cherry County,
Nebraska, witnesseth: That the said Wesley Slocum does on
his part state that whereas three of his own children, to wit:
Bertha Morse, Arthur Slocum, and Carl Slocum have filed with
the court an application wherein they allege and swear that I am
'childish and utterly incapable of transacting his business, even
of the simplest character,' and ask that I 'be declared a person
utterly incapable mentally to transact his own business or any
business whatsoever' and that a guardian be appointed over my
person and property; thereby depriving me of the right to con-
trol and manage the property earned by myself through long
years of hard labor. That in reliance upon these false and un-
just statements, the court appointed a temporary guardian over
my person and property, who, at the suggestion of my said chil-
dren has prevented me from going and making my home with
my son, Frank Slocum, in Nebraska. That since I have always
worked hard, saved and accumulated some property and when
I was no longer able to leave my home, I appointed Mr. Will
Thomas, a true and trusted friend, as my agent to act for and
with me in managing my property. That acting together we
disposed of my land in order that my business would be more
simple, and converted the proceeds thereof into first real estate
mortgages, with good security and bearing a good rate of
interest. That at no time have I squandered one penny of my
property, and my confidence has not been misplaced in selecting
Mr. Thomas as my agent. That all of my financial affairs were
being handled efficiently and well, but notwithstanding, my said
three children begun the said guardianship proceedings and
attempted to take from me the management of my said property,
and because thereof I feel very bitter towards them and want
them to have no share whatever in my property at my death.
And whereas my said son, Frank Slocum, left his ranch and
home in Nebraska more than a year ago, and with his wife came
to me in my sickness; stayed with me constantly, to the neglect
of his own affairs, nursed me and cared for me; all without com-
pensation or thought of reward. That because of the foregoing
facts, I have this day given and assigned unto my beloved daugh-
ter, Hattie Heeg, of De Kalb County, Illinois, a certain real
estate mortgage, executed by Arthur Slocum and Minnie Slocum,

his wife, in the sum of $3,000; instead of giving to her only $500 as I had intended to bequeath her by the terms of the will by me sometime ago revoked. That because of the foregoing facts, and in consideration of the covenants and agreements of my said son, Frank Slocum, hereinafter set forth, I have this day given to, transferred, and assigned to the said Frank Slocum, the following described property, to wit: By warranty deed, Lots one and fifteen (1-15) in Block thirty-four (34) in the town of Sibley, Osceola County, Iowa, and by assignment in writing, one certain real estate mortgage, executed by William T. Steiner and Pearl Steiner, to Wesley Slocum, in the sum of $19,490 which mortgage is recorded in Book 34 of land mortgages, page 24 of the records of Osceola County, Iowa. And one certain real estate mortgage, executed by James Gove and Ruth Gove, to Wesley Slocum, in the sum of $8,000; which mortgage is recorded in Book 77 of land mortgages page 557 of the records of Cottonwood County, Minnesota. It being expressly agreed and understood by the parties hereto that this contract and copy as well as said assignments and deed hereinbefore mentioned, shall be delivered to and remain in the hands of Clark & Dwinell, as agent for both of us, until such time as the said temporary guardianship shall have been disposed of and my property released to me, or at my death in case I do not survive such proceedings, when they shall be delivered to the present parties by our said agents, acting for this purpose, *and this contract shall then take effect.* Now, therefore, in consideration of the foregoing conveyances and assignments, party of the second part does on his part hereby undertake and agree with party of the first part that he will care for and keep in comfort during the remainder of his natural lifetime, party of the first part; that he will furnish him with all his wants during his lifetime and at his death, pay all necessary expenses of a funeral and burial befitting to one in the station and financial condition of party of the first part. Second party further expressly binds himself to be liable for and to pay any and all debts that may now be contracted or due and owing against first party at the present time. The foregoing conveyance and assignments are to be payment in full for all past services rendered and supplies furnished party of the first part by second party to date. Second

party further expressly agrees and undertakes to provide a home for first party wherever first party may desire to live, and to himself personally remain with him and care for, nurse, and handle him so long as he shall live or require such personal care and attention, and that under no circumstances shall party of second part leave first party in the hands of strangers or other members of his family for care and nursing; it being the belief of first party that no one can or will care for and nurse him as well and faithfully as second party. In witness whereof, we have hereunto set our hands and mark, the day first above written, at Sibley, Iowa.'' (Duly signed by both parties and witnessed by Will Thomas and L. A. Dwinell and duly acknowledged.)

The existence of the foregoing paper was not made known to the plaintiffs until after the death of Slocum. About the time of the appointment of the guardian, Frank had expressed the desire or purpose to return to Nebraska. Assuming that Frank would thus relinquish the care of his father, the guardian, acting under leave of court, entered into a contract with another person to care for the invalid, at a charge of $2,000 per year. Learning this, Frank decided to remain, and the contract with the third person being abandoned, he himself entered into a written contract with the guardian, in the following words:

''Article of Agreement.

''These articles of agreement entered into by and between T. S. Redmond as guardian of the person and property of Wesley Slocum, party of the first part, and Frank Slocum and ...... Slocum, parties of the second part, witnesseth: That the said party of the first part hereby hires and employs Frank Slocum and Effie Slocum, husband and wife, for a period of one year from and after June 1, 1918, for the purpose of the said Frank Slocum and Effie Slocum taking all proper care of the said Wesley Slocum, who is an invalid and confined to his bed, and in many respects absolutely helpless; that the said parties of the second part are to take all good and proper care of the said Wesley Slocum, to attend and wait upon him, and to nurse him at all times, both day and night and whenever necessary, and

the said parties of the second part are to furnish all proper and necessary food, groceries, provisions, and board for both themselves and for the said Wesley Slocum, and properly cook and prepare all proper and necessary food and provisions as may be found necessary from time to time; that the party of the first part is to furnish the home and residence of the said Wesley Slocum, together with all its household goods and equipment, for the said parties of the second part and the said Wesley Slocum and the party of the first part is also to furnish all necessary heat, fuel, light, water, telephone, medicines, if any, and physician or physicians that may be necessary to attend upon and prescribe for the said Wesley Slocum, and the party of the first part to pay to the parties of the second part the sum of two thousand five hundred ($2,500) dollars per year, payable monthly. This contract may be terminated upon thirty (30) days' written notice given by either party hereto to the other party or parties, but in case the parties of the second part shall have given thirty days' written notice to the party of the first part of their intention to terminate this contract, then and in that event, the parties of the second part agree to remain a reasonable time after the said thirty days shall have expired until such time as the party of the first part shall be able to procure another person or persons to wait upon, attend to, and nurse the said Wesley Slocum. It is further agreed by and between the parties hereto that all sums payable under this contract may be paid by the party of the first part to either of the parties of the second part, and when so paid shall be binding and conclusive upon both of the parties of the second part. In witness whereof the parties hereto have set their hands and seals this 1st day of June, 1918.'' (Signed by T. S. Redmond as guardian, and Frank Slocum and Effie Slocum.)

Recognizing the contract, the guardian continued to pay and the defendants continued to accept and receive the compensation therein provided for during all the ensuing period until the death of the ward. On October 23, 1918, several months after the appointment of the guardian and the execution of the contract between Frank Slocum and the guardian, and after the contract between Frank and his father, deposited in escrow, the difficulty of so construing these contracts that both

could be upheld appears to have suggested itself to the mind of some party in interest, and to obviate it if possible, still another paper was executed, as follows:

"Supplemental Statement to Contract.

"Whereas on the 16th day of May, 1918, the parties hereto, Wesley Slocum and Frank Slocum, entered into a written contract for life support. And whereas the whole intent of the parties thereto might not have been clearly and fully expressed therein, and acts and relations of the parties, since the execution thereof might be misunderstood, therefore said parties make and execute this supplemental statement, in order to clear up any and all doubt that might arise in connection with said contract and the acts of parties thereafter. With reference to the middle paragraph on page 3, of said contract, the parties state that it is and was the intent of the said Wesley Slocum, that the deed and assignments therein mentioned were to and did pass out of the possession and control of the said Wesley Slocum, and that they were delivered to the said Clark & Dwinell absolutely, to be held by them in escrow for the proper parties; time alone being wanting for the complete delivery thereof. That with special reference to the last part of the last sentence in said paragraph which reads as follows, 'and this contract shall then take effect,' parties state that said contract is in no manner related to the said deed and assignments, and the time and manner in which delivery thereof shall be complete, but that such sentence was inserted therein for the reason that at the time of the execution of said contract, the said Wesley Slocum was under temporary guardianship and his property in the possession of the guardian; that there remained no property in the hands of the said Wesley Slocum to pay or turn over to Frank Slocum for his services, hence it was agreed and understood between them that the said Frank Slocum was to continue with the caring for and nursing of the said Wesley Slocum during the pendency of the guardianship proceedings, and that Frank Slocum was to accept from the guardian a contract for the care of Wesley Slocum and be paid therefor by the guardian, in order that the said Frank Slocum would have funds with which

to live and maintain his family, and also in order that the said Frank Slocum could remain with and care for said Wesley Slocum instead of a certain stranger which guardian had already employed; both parties hereto knowing and understanding that the money that would be paid to the said Frank Slocum by the said guardian would be a part of and come from the property already given by Wesley Slocum to the said Frank Slocum, and that all parties in any manner interested in the estate of the said Wesley Slocum would be left in the same position and their several interests in no way affected. And that while the said contract was to and did take effect at the time of the execution thereof, yet the full provisions thereof could not be carried out so long as said Wesley Slocum was under the guardian disability. Dated this 23d day of October, 1918.'' (Signed by Wesley Slocum by his mark and by Frank Slocum. Mark witnessed by Will Thomas and L. A. Dwinell.)

Ordinarily, this court would not be justified in prolonging its opinion to set out *in haec verba* all the foregoing writings; but, as the rights of the parties will be largely determined by their legal force and effect, and as they serve also to illuminate the merits of the fact controversy, we have preferred to quote them at large, rather than to venture upon their abbreviation. The lines of contention were formed very soon after Slocum's death. The conveyance of the homestead to Frank, deed for which had been deposited in escrow with the contract of May 16, 1916, was revealed to the other parties by being placed on record on the day of the grantor's funeral. This was the signal for the war which has followed. On February 20, 1919, this action was begun to set aside said deed, as having been obtained by fraud and undue influence, and without consideration. The execution of the contract made between Frank and deceased on June 16, 1916, and deposited in escrow, by which deceased was to assign to Frank the note and mortgage for $8,000 and the note and mortgage for $19,400, was not made known to the plaintiffs until after this suit was in progress; whereupon the petition was amended to set them aside on the same grounds assigned for a cancellation of the deed of the homestead.

The trial court, after hearing a large mass of testimony, found for the plaintiffs, and set aside and canceled the deed of

the homestead and the assignment of the notes and mortgages in controversy.

I. It is the theory of the plaintiffs, and so charged in the petition, that, at the date of the contract of May 16, 1916, under which instrument the defendant claims to have acquired ownership of the property in controversy, Wesley Slocum was mentally incompetent to make a valid contract, and that his execution of the paper was obtained by undue influence. Upon this issue much evidence was offered on both sides. It is entirely too voluminous for its restatement here. It is enough to say that the case in this respect is typical of a class with which all our courts are familiar. Upon the general propositions of law applicable to issues of mental incompetency and undue influence, there is little room for argument, and the authority of the many precedents cited by counsel for appellants is the subject of no serious question. The trouble, if any, comes not in the statement of the law in the abstract, but in its application to concrete cases, which are rarely entirely parallel. This case, while having features quite similar to those found in the cited authorities, is not without others of a peculiar and unusual character. Wesley Slocum, at the age of about 80 years, found himself practically alone. His wife was dead, and his children had scattered, maintaining or building up homes of their own in four several states. So far as appears, his relations with them were then entirely amicable. There is no indication that he had any disposition to favor any one of them in preference to the others, or that he was under any special obligation to any one of them. His health was so impaired and his eyesight so dim that he felt himself unequal to bear the burden of the management of his estate, consisting of real property and personalty to the value of at least $30,000. It was under the stress of these circumstances that he tried for a short time the experiment of a voluntary guardianship. From the date of his second stroke, in May, 1916, he was substantially helpless, and became wholly dependent on others. For a time, his daughter from Illinois was with him, and with her help and that of Thomas and hired servants, he received proper care and attention until Frank came from Nebraska, in January, 1917, and assumed that duty for an agreed compensation of $2,500 per year; and this status was maintained until

the spring of the year 1918. By that time, Frank felt under necessity to return to Nebraska, and proposed to take his father, with him; but before that plan had assumed any definite shape, Slocum was for the third time stricken with paralysis, greatly aggravating his state of helplessness and dependence; and although his condition was such as to the ordinary reasonable comprehension would seem to preclude the idea of his being moved to Nebraska, his son appears to have still adhered to that plan. Others of the children were radically opposed to such move, and after the last paralytic attack, instituted guardianship proceedings, resulting in the appointment of Redmond to that trust, May 13, 1918. This appointment does not appear to have been contested, and the guardian so appointed immediately qualified, and continued to serve until the death of the ward. The appointment had been made and the guardian was in possession of the ward's property when the contract for the transfer of the property by the ward to Frank was made, May 16, 1918. That Slocum was at this time, and thenceforth to his death, extremely weak in both body and mind is very apparent; but whether such weakness and disability had reached the point of actual or entire incompetence is a question on which, under all the evidence, it is possible that reasonable minds may differ. It is a question upon which the decision of this case does not necessarily turn. It is, however, not open to reasonable doubt that the physical and mental condition of the sick man, especially after the second and third strokes of paralysis, was one of extreme weakness, in which he might easily be led or influenced by his attendants to do that which, under normal conditions, he would not do.

It was perhaps natural that the children other than Frank should view the installment of Frank in the immediate charge of the father, and his proposal to remove the old man to Nebraska, with a degree of disfavor, or even jealousy. Some of them believed that, when visiting their father, they were given no opportunity to see him or talk with him alone; and they appear to have suspected a purpose on Frank's part to absorb the estate, to the disadvantage of the rest of the family. On the other hand, Frank's admitted conduct in obtaining in a secret or furtive way the contract and deed of May 16, 1918, giving him

practically the entire estate, to the exclusion of his brothers and
sisters, and bringing those instruments to the light only after
their parent was dead, makes it quite easy to believe that the
suspicions entertained by the appellees were well grounded. That
the deceased in his weakness was led into statements and dec-
larations in the writing of May 16, 1918, which he could not
have intentionally made, is evident in the framework of the
writing itself. For example, he is there made to say that Frank
and wife had come to him in his sickness, and nursed and cared
for him, "all without compensation or thought of reward;"
when, if in his right mind, he knew that these filial services had
been rendered him for the by no means unremunerative wage of
$2,500 a year, which he himself had been paying Frank for more
than a year. The paper as a whole has more the appearance of
an elaborate argument prepared by counsel for future effect,
than for the simple purpose of transferring title to an item of
property. The situation was such as to render it easy to poison
the mind of the deceased against the children who procured the
appointment of the guardian, and it is clear that Frank was
not unwilling to profit by it. As to the connection of Thomas
with these transactions, it is not necessary to impute to him any
bad faith or attempt to mislead the deceased. It is very evident,
however, that, for what he doubtless thought good reason,
Thomas sympathized with Frank, and gave him the weight of
his friendly influence with the old gentleman. Without pursu-
ing these details further, we think it must be said that, even
if the contract were not open to other objections hereinafter
mentioned, the trial court must be sustained in holding it the
product of undue influence.

II. Thus far, we have not considered the legal effect of
the admitted fact that, at the date of the alleged contract of
May 16, 1918, Wesley Slocum was under guardianship, and that
the very property which was the subject of that
contract was in the custody and possession of
his guardian. This fact was known to all the
parties to that instrument, and expressly recognized therein.
The effect of the guardianship was, for the time being at least,
to deprive the ward of the legal capacity to sell and dispose of
such property. It did not, as a matter of law, conclusively

2. GUARDIAN AND
WARD: sale by
ward pending
guardianship.

establish the testamentary incapacity of the deceased, although it is prima-facie evidence of that fact. *Cahill v. Cahill*, 155 Iowa 340, 344, and cases there cited. But capacity to make a valid will may exist where capacity to enter into a valid contract is lacking. To say, however, that, after a guardian has been appointed and has entered upon the discharge of the duties of his trust, third parties, having full knowledge of the fact, may bargain with the ward and obtain from him a valid assignment or conveyance of his entire estate, and thereby oust the court of its jurisdiction over the ward's property, is to defeat the manifest intent and purpose of the statute.

That Slocum was a proper subject of guardianship, even though still having testamentary capacity, is not open to dispute in this collateral proceeding; but even if that question were before us, we think the fact is clearly established. See *Seerley v. Sater*, 68 Iowa 375; *Garretson v. Hubbard*, 110 Iowa 7; *Ockendon v. Barnes*, 43 Iowa 615; *Emerick v. Emerick*, 83 Iowa 411; *Guthrie v. Guthrie*, 84 Iowa 372; *Smith v. Hickenbottom*, 57 Iowa 733, 734.

It is to be further said that the alleged contract appears upon its face to recognize the legal insufficiency of the instrument as a contract, and to indicate only a tentative purpose to so dispose of the property, in the event that the guardianship proceedings be finally dismissed. This quite clearly appears from the provision found in the writing which reads as follows:

"It being expressly agreed and understood by the parties hereto that this contract and copy as well as said assignments and deed hereinbefore mentioned shall be delivered to and remain in the hands of Clark & Dwinell as agents for both of us until such time as the said temporary guardianship shall have been disposed of and my property released to me, or at my death in case I do not survive such proceedings when they shall be delivered to the present parties by our said agents *and this contract shall then take effect.*"

It follows, we think, both from the legal incapacity of Slocum to enter into such an agreement and from the express recognition of that fact by the terms of the instrument itself, that the trial court did not err in holding it to be void and of no effect. We do not overlook the writing entitled "Supple-

mental Statement to Contract," bearing date of October 23, 1918. This instrument is a labored and ingenious effort to avoid the effect of the contract of June 1, 1918, between the defendants and Redmond, as the guardian of Slocum, hereinbefore quoted in full. It is sufficient to say in this respect that the same legal incapacity of the ward to give legal effect to the contract of May 16, 1918, vitiates the so-called "supplement" thereto, the guardianship being still pending, and the ward being still without power to sell or assign the property or assets then in the hands of the guardian.

III. Were there no other insuperable objection to the defendant's claim of title under said alleged contract, it would still be necessary to hold that whatever right or advantage defendants acquired by virtue of that instrument was later surrendered and abandoned, when they voluntarily entered into the agreement with the guardian for the care, nursing, and attention required by Slocum. It will be seen that, by the terms of the writing under which he now claims, Frank expressly undertook to keep and care for Slocum during the remainder of his natural life, provide for his needs, and defray the expenses of his sickness and funeral. That obligation he did not perform, and, so far as the record reveals, never offered to perform. On the contrary, some two weeks after the signing of that paper, he entered into the written contract with Slocum's guardian by which, in consideration of $2,500 per year, payable in monthly installments, he undertook to take care of the old gentleman, described as being in "many respects absolutely helpless," and to give him all needed nursing and attention. From that time forward, to the end of the old man's life, the parties on both sides observed the terms of that agreement, defendants giving the invalid support, care, and nursing, and receiving from the guardian the stipulated compensation therefor. During all that time, defendants asserted no right, title, or interest in or to the property of the deceased under the alleged prior contract. Indeed, the very existence of such instrument appears to have been kept a secret, buried in the breasts of those taking part in its procurement, until brought forth after this suit was begun.

Counsel on either side have quite elaborately argued the

3. CONTRACTS: waiver and substitution.

question whether the execution of the contract between defendants and the guardian operated as a novation of the earlier one alleged to have been made between defendants and the deceased. We think it not material to discuss or decide whether a novation was effected. Indeed, for the purposes of this appeal, it may be conceded that there was no technical novation. But it is an elementary proposition that, even if the contract of May 16, 1918, should be held to have been valid when made, it was still competent for the parties thereto to abandon it, or to substitute another in its place, or, by conduct inconsistent with the continued existence of the original contract, to estop themselves from asserting any right thereunder. 3 Elliott on Contracts, Section 1865; 3 Am. & Eng. Encyc. of Law (1st Ed.) 891; 2 Warvelle on Vendors 870; *Myers v. Carnahan*, 61 W. Va. 414; *Hall v. Wright*, 138 Ky. 71. This rule is especially applicable where, as in this case, the alleged first contract is wholly executory. The agreement with the guardian to keep and care for the ward at a stated consideration, payable by the guardian, is inconsistent with defendant's assertion of title under an earlier contract, by which, in consideration of the transfer of such title to him, he took upon himself the obligation to furnish such support and care at his own expense.

He has been paid the agreed value of his services to the deceased; he has paid no part of the promised consideration for such transfer of title; he succeeds to his equal share as an heir of the deceased; and the decree appealed from affords him no just ground of complaint. The decree of the district court is—
*Affirmed.*

STEVENS, C. J., PRESTON and DE GRAFF, JJ., concur.