HERMAN REIT, SR., Appellee, v. H. J. DRIESEN et al., Appellees, JOHN WYNIA, Appellant.

No. 40842.

JUNE 20, 1931.

Hatley & Van De Steeg, for appellant.

Van Oosterhout & Kolyn, for appellee Herman Reit, Sr.

Klay & Klay, for appellees P. Ver Burg and Dena Ver Burg.

MORLING, J.—On May 14, 1920, Wynia, who was then the

owner of the mortgaged premises under deed by which he had assumed payment of the mortgage in suit, and Ver Burg and Koopmans made a contract by which Wynia sold the mortgaged quarter section to Ver Burg and Koopmans for $70,000, of which $2500 was paid in cash, $12,500 was to be paid March 1, 1920 (1921?), $5,000 March 1, 1926, $24,000 by assuming the first mortgage held by plaintiff. The contract provided that deed and possession would be given March 1, 1921, and second mortgage given for the balance of $26,000 due March 1, 1936. Ver Burg acquired Koopmans' interest and later sold a half interest to Bonthuis. Wynia made out deed for his original vendees for the whole 160 acres, deposited it with the bank and directed second mortgage to be prepared as called for by the contract. After negotiations, which will be referred to later, Wynia on March 16, 1921, executed to Ver Burg a warranty deed for the east eighty, excepting from the covenants "a first mortgage of $24,000 now of record covering this and other lands—and $12,000 of which grantee assumes and agrees to pay as follows," (setting out the payments as called for by the mortgage to plaintiff). Wynia at the same time executed an identical deed to Bonthuis for the west eighty wherein Bonthuis assumed $12,000 of the mortgage. Wynia pleads that Ver Burg orally requested him as an accommodation to convey the west eighty separately to Bonthuis and the east eighty separately to Ver Burg; that as an accommodation Wynia did so convey, but received no consideration for conveying the eighty to Ver Burg separately; that Wynia is principal only as to the plaintiff and surety as to Ver Burg and Bonthuis; that the market value of the mortgaged premises is less than the amount of plaintiff's mortgage and the market value of the east eighty is much greater than that of the west eighty; that when the deeds were made it was orally agreed that the contract should not be changed or abandoned as to the liability of Ver Burg on plaintiff's mortgage and that such liability should remain in full force. Wynia prays that the court fix the order of liability of defendants to plaintiff as to principalship and suretyship; that the mortgaged premises be sold en masse; that if a deficiency remains general execution issue against Ver Burg. Wynia testifies he executed deed to Ver Burg and Blankespoor (Koopmans?) and deposited it with the State Bank; that he

had the cashier prepare a mortgage and left it for the vendees to sign; that Ver Burg did not say anything about paying up until March 16th, when "Ver Burg wanted to know what I wanted to do in regard to the price of the land. * * * I felt disposed to throw off. * * * We finally agreed to $400 per acre * * * Ver Burg wanted a new contract drawn. * * * I told him I would not do it. I wanted that old contract to stand. * * * Because * * * I was looking toward them that is, Pete Ver Burg and Blankespoor (Koopmans?) for the $24,000 mortgage. Q. What did he say? * * * Why he wanted two deeds. Q. What did you say to that? A. I told him I didn't have to give two deeds, my contract called for one. * * * and I wouldn't give him two deeds. * * * Because I was looking toward them. If I would give two deeds I was afraid I would lose my rights on the contract because I was looking toward him for the $24,000 mortgage. * * * Finally I told him I would give him two deeds but I was looking toward Ver Burg and Blankespoor for the $24,000. We then talked about the payments. I told him that was between them to settle. I hadn't sold to Bonthuis. Then they left the room. After we decided on two deeds, he said, 'Now we better draw a new contract.' I told him I would not do it. They were gone a little while and when they came in they said they would give me a mortgage of $10,500 on the eighty and a $5,000 first mortgage on the 91 acre Lem's land. (Mortgage held by Bonthuis on an independent tract.) I wanted to know if it was the best he could do. He said I would have to take that, it was all he could pay. He said he would pay around $3,000 cash. * * * Bonthuis gave me the $10,500 mortgage on the west eighty, the $5,000 Lem's mortgage and Ver Burg was to give me an $8,000 first mortgage on 40 acres in Lyon county, a $5,500 second mortgage back on the east eighty and the balance in cash. They paid me $8,500 in cash. I do not know how they divided it. I reduced the consideration from $70,000 to $64,000. Q. And how about this $24,000 mortgage. Was that deducted from the purchase price? A. Yes, sir. No part of it was paid. There is no doubt about that. The $24,000 mortgage, the $2,500 cash when the contract was made, the $8,000 Ver Burg mortgage, the $5,500 Ver Burg mortgage, the $10,500 Bonthuis mortgage, the $5,000 Lem's mortgage and the $8,500 cash made up the $64,000 total. * * * Q. Well, now,

after you had agreed upon the payment as you have detailed what did Ver Burg say to you again? A. He still wanted a new contract. I didn't do it and we then left the bank. That evening Ver Burg came to the house and told me he had a second or third mortgage for $4,339.00 and he would give me a note for $1,200 to be paid in three years which I accepted and gave him back his unrecorded second mortgage on the East 80. I told them I didn't care how they settled the $24,000 mortgage between them. * * * I never executed and delivered a deed to Blankespoor and Ver Burg on the whole quarter. * * * I told Ver Burg I was looking toward him for the $24,000 mortgage on the contract." Wynia also testifies: "Ver Burg was over to the shop several times and talked about the matter. I told him I was ready to settle, all the papers were at the State Bank. * * * I did not expect Bonthuis at the First National Bank when I went there to settle. * * * These talks were short, they would ask me what I wanted to do in regard to the land deal and I told Peter Ver Burg that the deed and mortgage were at the State Bank and he could go over and settle up any time he wanted to. * * * We talked about the abstract a day or two before the settlement but did not then talk about how much I would throw off."

McGill, an attorney and vice president of the bank, testifies that:

"As I remember it, Ver Burg wanted a new contract. * * * I remember that there was objection on the part of Wynia to making a new contract and none was made to my knowledge. * * * I cannot remember what he said about it but I do remember he was reluctant to making the two deeds. He was afraid he might be losing some rights under his contract between himself and Mr. Ver Burg. * * * When I went there (to Bonthuis' home in 1926) to see him about the $10,500 mortgage * * * I took back a second mortgage on the 300 acres for about half the $10,500 mortgage and released that."

Dykstra testified:

"They agreed to make it $400 instead of $437.50 per acre. * * * Ver Burg wanted a new contract and John Wynia said he won't have anything to do with that. 'I have got a contract and I will stick to that.' * * * Ver Burg asked for two deeds.

He said he could separate a little better between him and Bonthuis and each have his own deed because he sold his eighty to Bonthuis and that could be fixed right away just as well, otherwise, he would have to give Bonthuis a deed again. He asked for two separate deeds and Wynia wouldn't give that and I finally advised Wynia and said, 'John that hasn't got anything to do with it.' * * * I said to Frank McGill, 'Don't you think so, Frank?' And Frank said 'no,' not as long as he kept the old contract. * * * He (Wynia) said if it wouldn't hurt any contract, 'then I don't care.' * * * After that Ver Burg and Bonthuis left the room ten or fifteen minutes. When they came back, Bonthuis said that he thought he couldn't raise quite so much money as he had to and Ver Burg said 'he can't raise that much,' and Wynia said 'I don't care. I haven't anything to do with it. That is up to you fellows.' Then they made a kind of a settlement and a mortgage and all sorts of things for payments. * * * Ver Burg repeated it three or four times in the back room of the bank, he asked for a new contract but Wynia said he wouldn't have anything to do with a new contract.''

■ That objection to this testimony as an attempt to contradict and vary the deed was made in proper time and form is not questioned. Ver Burg testifies that he sold part of the land to Bonthuis in August, 1920; that he had the conversation with Wynia; ''When we started to settle up with him * * * I think from about the 1st of March on until we got settled. Wynia agreed that he would take $3,000 off of each eighty. They said they were going to settle with Bonthuis because he was well off financially so they were going to deed the eighty to him and the other eighty to me. * * * I didn't say anything to that. I couldn't help myself. It was all right to me if they did that. * * * Q. Well, was there anything else said with regard to the details or how it was going to be settled, that you remember, that you haven't told us about? A. No. * * * Q. Did Wynia at any time, during these talks say that he wanted the old contract to remain in force? A. No, sir. * * * (Cross Examination.) On the afternoon of the 16th we went to the First National Bank * * * I said we were ready to draw up the papers. John Wynia told Frank McGill what to put into these two deeds. I said that was all right. * * * I didn't ask Wynia

for a new contract and if Frank McGill testified that I did, he was mistaken. Wynia did not say anything about looking to me and Blankespoor to make good on the $24,000 mortgage. * * * I didn't want to cut across to save a deed. * * * Mr. Wynia did not tell me that he wanted a new contract or that he was looking to me for the $24,000 mortgage or anything about losing his rights by giving two deeds.''

As will be noticed according to the testimony of both parties they on March sixteenth understood that they were making a settlement pursuant to the contract. There is no evidence on either side that Ver Burg, expressly or in terms, assented to the contract remaining in force. Whether Wynia's evidence is or is not construed as showing an agreement express or implied that the assumption clause of the original contract of sale should remain in force, the undisputed evidence is that an entirely new arrangement, inconsistent with the contract, covering the whole subject matter of the purchase of the land and of settlement was made. By the original contract Wynia agreed to convey to Ver Burg and Koopmans and they agreed to pay the purchase price according to specified terms, including the payment of the $24,000 mortgage. Under the contract Wynia was entitled to the benefit of the covenants of Ver Burg and Koopmans only and was required to convey to them or their assignees. By the arrangement of March 16, 1921, Wynia conveyed one eighty to Bonthuis and obtained Bonthuis' assumption of one-half of the mortgage and obtained also from Bonthuis Bonthuis' contribution to the cash payment. Wynia obtained from Ver Burg an $8,000 mortgage on a 40 acres and the second mortgage for $5,500 on the east eighty. The price of the land was reduced $6,000.

While Wynia claims that $24,000 was deducted from the purchase price, the purchase price was the purchase price of the sale and conveyance of the two eighties separately made that day, March sixteenth. The mortgage was not deducted from the $70,000 purchase price of the contract as made May 14, 1920. The $12,000, which was deducted from the purchase price of the east eighty conveyed to Ver Burg, has been paid through the foreclosure-proceedings in controversy. It is the unpaid portion of the $12,000 of the purchase price of the eighty conveyed to Bonthuis that Wynia asks to have established as

the primary indebtedness to Ver Burg. The transaction of March 16, 1921, was an entirely new contract represented by the payments, transfer and the two deeds made that day. Its provisions were entirely inconsistent in respect to parties, price, terms, payments, conveyance, assumption clause and covenants on both sides from those of the contract of May 14, 1920. By the covenant of his deed to Ver Burg, Wynia warrants to Ver Burg the title to the eighty, except the mortgage of $24,000, and Ver Burg alone assumed and agreed to pay $12,000, and $12,000 only, of that mortgage, whereas by the original contract he, with Koopmans, agreed to pay the whole $24,000. To admit the evidence as Wynia claims it to be that the obligation of Ver Burg under the first contract to pay the whole $24,000 was preserved would be to vary and add to the written agreement as represented by the deed. Parol evidence of such an agreement is inadmissible. Winn v. Murehead, 52 Iowa 64; 22 C. J. 1127.

■ Whether it be termed a substitution, waiver, abrogation, merger, abandonment, novation or rescission of the first contract, the arrangement of March 16, 1921, constituted a new contract in which the previous contract was merged and by which it was discharged. Morse v. Slocum, 192 Iowa 1080, 1094; Royal Union Life Ins. Co. v. Hughes, 205 Iowa 563, 566; Huxford v. Trustees, 193 Iowa 134, 138; Davenport v. Whisler, 46 Iowa 287, 291; McNair v. Sockriter, 199 Iowa 1176, 1185; Hawkeye Clay Works v. Globe & R. Fire Ins. Co., 202 Iowa 1270, 1274; American Savings Bank v. Borcherding, 201 Iowa 765, 768; Housekeeper Pub. Co. v. Swift, 97 Fed. 290; Bruce v. Oberbillig, 268 Pac. (Ida.) 35; 13 C. J. 597; 4 Page Contracts, 2nd Ed., Sec. 2489, et seq.

The evidence is not admissible on the theory that it shows the consideration to be paid, for the consideration in question here is the consideration of the new contract made March 16, 1921. That consideration has been paid, and hence Hawn v. Malone, 188 Iowa 439, and similar cases are not in point. Were fraud, accident or mistake pleaded and proved or reformation asked for we might have a different question.—Affirmed.

FAVILLE, C. J., and EVANS, STEVENS, ALBERT, KINDIG, WAGNER, and GRIMM, JJ., concur.