### HALE v. CAMPBELL et al.
### No. 36.

District Court, N. D. Iowa,
Central Division.

Sept. 17, 1942.

Alan Loth and Thomas M. Healy, both of Fort Dodge, Iowa, and C. A. Smedal, of Ames, Iowa, for plaintiff.

Dwight G. Rider, D. M. Kelleher, and Maurice J. Breen, all of Fort Dodge, Iowa, for defendants.

·NORDBYE, District Judge (under special assignment to District Court, Northern District of Iowa).

Henry and Elizabeth Hale were married in 1920. In 1922, Elizabeth inherited from her father's estate approximately $411,500 in Iowa municipal bonds. In 1924, she executed a bill of sale to Henry of an undivided one-half interest in all of these bonds. It appears that some time after the marriage, the Hales acquired various pieces of real estate, the deeds running to both spouses. They had no children, but shortly after this bill of sale was executed, they took two small children, Herman and Betty, to rear. Apparently neither of these children was ever formally adopted, but were referred to as the wards of the Hales. On April 22, 1929, the Hales executed and acknowledged reciprocal contracts, identical in form except that in one Elizabeth C. Hale is the first party and grantor, with Henry O. Hale as grantee, and in the other, Henry O. Hale is the first party and grantor, and Elizabeth C. Hale the grantee.

The contract executed by Elizabeth Hale as grantor is the basis of this suit, and it is upon this writing that plaintiff contends he has succeeded to all right, title and possession of all the property which Elizabeth C. Hale possessed at the time of her death in 1938. This contract reads:

"Contract

"This Contract and agreement made and entered into by and between Elizabeth C. Hale, Party of the First Part, and Henry O. Hale, Party of the Second Part, Witnesseth:

"That for and in consideration of the sum of One Dollar ($1.00) and Other Valuable Consideration, the Party of the First Part hereby transfers, sells and assigns to the Party of the Second Part all property of all kinds now or hereafter owned by the party of the first part, absolutely and unconditionally, except with the reservation that the use and enjoyment of said property by the party of the second part shall not commence or begin until the death of the Party of the First Part.

"Dated at Fort Dodge, Iowa, this 22nd day of April, 1929.

"Elizabeth C. Hale
"First Party
"Henry O. Hale
"Second Party

"State of Iowa ⎱ ss.
"Webster County ⎰

"Be It Remembered that on this 22nd day of April, A. D., 1929, before me, the undersigned, a notary public in and for Webster County, Iowa, personally appeared Elizabeth C. Hale and Henry O. Hale, to me personally known to be the parties named in the foregoing instrument and they did acknowledge the execution thereof to be their voluntary act and deed for the purposes therein set forth.

"Kathryn Hillman

"Notary Public in and for Webster County, Iowa."

(Seal)

It may be pointed out that the two contracts were drawn at the same time by an attorney now dead, and were executed simultaneously but were never recorded.

It is to be gathered from the testimony that the Hales were not entirely satisfied that the reciprocal contracts would do that which the parties had intended. It appears that in April, 1932, Elizabeth's mother died, and from her Elizabeth inherited substantial additional property, mostly in mu-

nicipal bonds. Elizabeth was concerned over the effectiveness of the 1929 contracts, particularly with reference to the after-acquired property. After conferring with her attorney, it was decided that reciprocal wills should be drawn so that if the contracts were not valid or effective as to after-acquired property, reciprocal wills would accomplish that which the parties had assumed to be the effect of the 1929 contracts. Henry was present at these conferences, and he and Elizabeth executed reciprocal wills on June 4, 1932. These two wills devised and bequeathed all of the property of each spouse to the other, and the result was that the survivor would take all of the property which the Hales possessed jointly or in severalty.

Later, the Hales again consulted counsel regarding codicils to the reciprocal wills which had been drawn and there was considerable talk regarding the advisability of drawing new wills. It may be gathered that the parties recognized that the reciprocal wills were more or less temporary, in that it was deemed advisable either to add codicils thereto or to execute new wills so as to provide for certain beneficiaries other than the respective spouses. During the year 1933, and in the early part thereof, several drafts of wills were drawn. These tentative wills provided for trusts for the benefit of the two children, Herman and Betty. Apparently, both Henry and Elizabeth had concluded that a trust should be created so that an income of $200 a month would be produced for each child. In so far as Herman was concerned, the corpus was to be paid to him when he reached the age of 35; Betty's income of $200 a month, however, was to be paid to her during her lifetime. It fairly appears that the wills thus contemplated were to be identical, except that in Henry's will some provision was made for his aged father.

No action was taken, however, with reference to a new will until the Fall of 1933, when Elizabeth executed her will. Henry, however, did not make a new will. The will executed by Elizabeth was not, therefore, a reciprocal will and is not now extant. Whether she left the bulk of her estate to Henry and incorporated the various trust features which were contemplated is not definitely known. However, additional light is thrown upon the contents of the 1933 will by reason of the fact that in 1935 she executed a codicil to this will. A copy of the codicil is in evidence and is revealing. It clearly indicates that two trusts were created in the 1933 will; that Henry was appointed as trustee; and that the following provision was made with reference to a successor trustee:

"If my husband shall die before the termination of either trust created herein, then Myrtle Malone and Wallace Malone of (now) Hammond, Kansas, or the survivor of them, shall succeed as such trustee."

In lieu of this provision, she provided in her codicil that if her husband, Henry, should die before the termination of either trust, the District Court having jurisdiction of the beneficiaries of the trust should appoint a suitable person as successor trustee and give preference to the person nominated by the beneficiaries. It further appears that her husband was not appointed as executor in this will, in that one Roene Brooks was nominated executrix, and the codicil provides that, in lieu of such provision, Herman O. Hale and Betty Hale should be appointed executors.

In 1937, Elizabeth became ill and expressed a desire to make another will. Henry interested himself in looking after the arrangements, and procured someone to draw the will, which was executed on July 7, 1937. After this will was executed, Henry destroyed the 1933 will, together with the codicil of 1935. This new will gave to Betty $5,000; to Herman, certain real estate and $30,000 in cash, and in the event that he was completing a course of education at the date of the testate's decease, then up to $1,000 should be advanced by the executor for the purpose of allowing him to finish his education. Two other small bequests were made, and the remainder of the estate was left to Henry.

Some time prior to March 3, 1938, a dispute had arisen between Henry and his ward Herman. The evidence does not indicate the exact nature of the dispute, but it had something to do with Herman's right to visit his foster mother during her illness. In any event, Herman brought an action in court seeking to have a guardian appointed for Elizabeth so that she might be removed from the home to a hospital, where he, Herman, would be in a position to visit her. The lawsuit which was brought by Herman was settled on March 3, 1938, by a written agreement between Henry as the party of the first part and Herman as

the party of the second part. In the agreement, Henry agreed that he would "permit the said Herman O. Hale, individually, to visit the said Elizabeth C. Hale at her home each Sunday afternoon not for longer than three minutes at a time, unless her personal physician will permit a longer visit." The agreement recites that "each party hereto agrees not to contest or oppose the probate, execution or enforcement of the will of Elizabeth C. Hale last above referred to." (This refers to the July, 1937, will). Then the agreement continues:

"If Elizabeth C. Hale shall revoke or diminish the provisions in said will made for second party, then it is agreed as follows:

"First party will, if he survive her and receive under any new will more than he would take in case of her intestacy elect to take under such new will; or if such new will leaves first party less than he would take in case of her intestacy, then he will elect to take under the law; and in either such event, first party will, from her property thus taken, turn over to second party within one year from her death, sufficient property so that with any property devised to him by Elizabeth C. Hale, second party will receive the equivalent of the provision in her present will aforesaid. But if any new will of Elizabeth C. Hale shall leave second party the equivalent of what is given him under her present will aforesaid, then first party will not be obliged to add thereto because of his Paragraph 3. And if Elizabeth C. Hale should by assignment or conveyance to first party so diminish her estate as to impair or reduce the bequest to second party, then first party will turn over to the second party, within one year from her death, sufficient property so that second party will receive the equivalent of the provision of her will aforesaid. The intent of this paragraph is that if Elizabeth C. Hale revokes her aforesaid will or the bequest to the second party, then first party shall, from so much of her estate as he may receive, either as beneficiary, heir-at-law, or assignee prior to her death, and subsequent to the making of this agreement, reimburse and make whole to the second party the provisions set forth in the will above referred to."

It will be observed from the recitals of the agreement that Henry recognized and conceded that Elizabeth had the legal right to make a new will wherein she could make any disposition of her property which she desired. He recognized that if she disinherited him his only recourse would be to take under the statute. Further, it may be pointed out that both Henry and Herman expressly agreed not to contest or oppose the enforcement of Elizabeth's will. The significance of these recitals will be commented upon later.

Elizabeth Hale died on May 5, 1938. Four days after her death, Henry presented the July, 1937, will for probate. Under the will, one O. M. Thatcher was appointed executor, but Elizabeth had expressed the desire in her will that Henry should act in an advisory capacity to the executor. Thereafter, the will was admitted to probate, and Henry at all times during the course of probate acted as adviser to the executor and was, or is to be, paid some $3,500 for his services as such adviser. Schedules were prepared by Henry's lawyer, listing the bonds belonging to Elizabeth and inventorying those in which she owned an undivided one-half interest and those which she owned in severalty. All of the schedules and inventories pertaining to the properties which Elizabeth had at her death were prepared with the aid and under the direction of Henry. During the administration, rents were received from tenants occupying farms, the titles to which were in the names of Henry and Elizabeth. Henry collected the rents and accounted to the executor for Elizabeth's one-half share. In receiving partial distribution of the estate in June, 1939, Henry signed a receipt acknowledging that Elizabeth C. Hale, at the time of her death, owned a one-half interest in all of the bonds in safety deposit box 8654, and individually owned all of the bonds which were deposited in safety deposit box 2814. Furthermore, it may be pointed out that in 1940 a dispute arose with the Internal Revenue Department regarding the estate taxes. Apparently, for some reason, the executor neglected or refused to make any protest, and the protest was therefore lodged by Henry. The protest was in writing and was prepared by Henry's personal counsel, and discloses the position taken by Henry at that time with respect to the arrangement made between the Hales with reference to the division of certain bonds formerly owned by them jointly, and the recognition by Henry that certain bonds which had thus been divided were deposited in Elizabeth's personal safe-

ty deposit box. This protest has been marked Exhibit F, and it is therein stated that, at the time of the death of Mrs. Farley, Elizabeth's mother, in 1932, Henry and his wife owned most of their property jointly, but thereafter agreed to divide a substantial amount of bonds between them in individual ownership, and that Elizabeth's bonds were deposited in safety deposit box 2814 and Henry's in safety deposit box 9613. The taxing authorities had assumed to tax the bonds in box 9613 which Henry claimed as his own individual bonds, and which had been turned over to him in accordance with the division referred to, and in this protest he states:

"In Henry O. Hale's box 9613. Decedent owned no part of these securities at her death. They belonged to her husband, just as the securities in Box 2814 belonged wholly to her, as returned. The separate ownerships were the result of a division of what had previously been joint property."

Early in 1940, these defendants, heirs at law of Elizabeth C. Hale, commenced proceedings to contest her July, 1937, will. The attack on the will is based upon the charge of undue influence, and that at the time she executed this will she was mentally incompetent to execute a testament. Until this time, plaintiff did not know of any impending contest, and in his defense to the suit contesting the will, among other defenses, he urged that the contract of April, 1929, running from Elizabeth to him, established full ownership of all of the property in question, and that the heirs, therefore, could have no interest in said property or in contesting or attacking the will. A motion to strike this defense was granted, without prejudice, however, to the right of the plaintiff to proceed elsewhere with any claim based on the contract in question. The suit in this Court followed.

When this action was instituted, the plaintiff based his right to establish his claim to quiet and confirm his title to the property in question by reason of the 1929 contract running from Elizabeth C. Hale to Henry O. Hale. No reference in the bill of complaint was made to the reciprocal contract executed at the same time running from Henry to Elizabeth, nor is there any allegation that a survivorship contract had been entered into between the parties. In response to plaintiff's contentions that, by reason of the 1929 contract, running from Elizabeth to him, he can proceed under Section 57 of the Judicial Code, 28 U.S.C.A. § 118, to confirm and establish his claim to the property in controversy herein, the defendants urge the following:

1. The 1929 contracts must be considered together and are testamentary in character in that no interest in the respective properties was intended to pass to the grantee until the death of the grantor, and if the contract upon which this action is based is a will, it is void because of the failure to comply with the Iowa statute pertaining to the execution of wills.

2. If the writings are construed to be conveyances rather than wills, then the execution thereof became futile in that they were mutually destructive; that after the execution and delivery of the writings, each party owning an undivided one-half interest in the lands and bonds necessarily became a grantee of an undivided one-half interest in the identical property after the writings became effective.

3. That if the writings and other evidence establish a contract of survivorship, as plaintiff now asserts, and denote an agreement whereby the survivor shall take all of the property of the first to decease, then the evidence herein requires a finding that such agreement was mutually abandoned and discarded.

4. That plaintiff has, by his conduct and actions, unmistakably elected that the property in controversy herein should be administered as the property of Elizabeth C. Hale.

5. That if plaintiff predicates his claim upon a contract right, and seeks enforcement of such contract by specific performance, declaratory judgment, or otherwise in equity, no jurisdiction is obtained herein against these non-resident defendants in an action under Section 57 of the Judicial Code.

The contracts of 1929 must be considered together and construed as a whole. Bigelow v. Wilson, 77 Iowa 603, 42 N.W. 501. The decisions of this State uniformly hold that: "If the instrument passes a present interest, although the right to its possession and enjoyment may not accrue till some future time, it is a deed or contract; but if the instrument does not pass an interest or right till the death of the maker, it is a will, or testamentary

paper." Burlington University v. Barrett, 22 Iowa 60, 72, 92 Am.Dec. 376; Shaull v. Shaull, 182 Iowa 770, 166 N.W. 301, 11 A.L.R. 15. If we were only considering the instrument running to Henry, then there would be no particular difficulty in determining the intention of the parties. This instrument, considered alone, is unambiguous and assumes to convey to the grantee a present interest in all of the property of the grantor, reserving the use and possession to the grantor during her lifetime. However, in considering the reciprocal contracts, it seems apparent that, after the exchange of the writings, the parties were exactly in the same situation that they were in before the exchange of the conveyances. At that time, the Hales owned substantially all of their property, real and personal, in joint ownership. It must follow, therefore, that if these instruments are to be considered as deeds, after their delivery Henry's undivided one-half went to Elizabeth and Elizabeth's undivided one-half went to Henry. No change resulted in their respective ownerships of real and personal property. It may be argued that surely the parties did not intend any such futility. But if there was an intention to produce a transfer of a present interest in the property of the grantor to the grantee, the futility seems apparent notwithstanding its absurdity. These writings are not ambiguous even though that which follows their exchange seems useless. It may be that it was thought wise and prudent to execute these contracts of conveyance so that the survivor could, at the death of the grantor, record the document and thus obtain the undivided one-half interest of the property belonging to the decedent without resorting to the expense of probate proceedings. But if that was to be accomplished, it seems evident that it must have been planned, if the parties gave it any thought, that the survivor would then destroy or otherwise dispose of the contract in which he was the grantor, and merely file the decedent's conveyance. However, if this was the intention, plan, or scheme, it would follow that neither party intended the conveyance of a present interest to the other during the lifetime of the parties, and anticipated that only one contract was to become operative and that upon the death of one of the parties thereto. It is difficult to escape the conclusion that, if this be the correct construction of the writings and intention of the parties,

the contracts of 1929 would be testamentary in character because the parties intended that no present interest in the property should pass. Admittedly, to attempt to ascertain the intention of the parties from these writings and the pertinent facts and circumstances is most difficult. As stated before, the lawyer who drew the contracts is now dead. Elizabeth has passed away, and Henry, by reason of the limitations of the statute, is not permitted to testify as to what was said between the parties. It may well be that the parties themselves did not entertain any clear understanding as to the effect of these reciprocal contracts. Unless they anticipated an aimless and futile result, it is more reasonable to find that it was thought expedient to permit the survivor to be in possession of a deed which was not to be effective until the death of the grantor.

Plaintiff, apparently recognizing the dilemma which the contracts created in the event a literal interpretation is to be ascribed to them, suggests that these writings are evidence of an agreement between the parties that the survivor should succeed to the title and possession of all the property owned by the parties. He seeks to enforce that right herein although the action is bottomed on a straight conveyance to him as indicated by one of the writings. It must be recognized that there is evidence which seems entirely credible that these parties did have in mind at that time, and had agreed at or about the time the 1929 contracts were executed, that the survivor should inherit or succeed to the property of the first to die. It is plaintiff's position, therefore, that instead of importing to the writings a purposeless result, each writing indicates, and is consistent with, an intention and agreement between the parties that only the survivor of the two should have the decedent's property. Further, it is asserted that an agreement for future ownership, contingent upon survivorship, is not testamentary in character; that the present right and obligation created under such contract constitutes a present interest within the rule. His position is sustained in this regard in the following: Manchester v. Loomis, 191 Iowa 554, 181 N.W. 415; Stewart v. Todd, 190 Iowa 283, 173 N.W. 619, 180 N.W. 146, 20 A.L.R. 1272. Moreover, plaintiff urges the principle that if the writing is void as a will, the courts will, if possible, construe it as a valid contract. Citing Shaull v. Shaull,

supra. But if a survivorship contract is to be spelled out of these writings and the attendant circumstances, it would seem that the parties entered into the contract in light of the then situation, and that subsequent events and circumstances require a finding that the parties intended to, and did abandon the plan and arrangement which at one time may have seemed satisfactory to them.

■ Whether it was intended by the Hales that the reciprocal wills should be substituted for the contracts and used instead of the contracts and prior arrangements to carry out their wishes and desires, must be determined from that which took place at that time and subsequent thereto. That the reciprocal wills which were executed were merely complementary to the contracts of survivorship may seem plausible were it not for the almost immediate plan to change these wills. The mere fact that the two 1929 contracts were not destroyed is of no particular significance. It may be pointed out that the reciprocal wills were also kept intact although Elizabeth made two wills thereafter. The impelling fact remains that whatever the Hales may have desired to accomplish at the time that they deemed that the execution of the reciprocal wills was the better way to proceed, that which occurred thereafter strongly suggests that neither of the Hales assumed that they were bound by·any survivorship contract, and if they were, by their acts and conduct they clearly abandoned the same by mutual consent. In this connection, it may be stated that the various acts of the parties manifest an understanding on their part that the contracts of 1929 and the reciprocal wills were not final and did not permanently fix the rights of the parties with respect to the property of the other. It seems evident that the parties understood that the reciprocal wills of 1932 were merely provisional and were subject to change. Both Henry and Elizabeth discussed with their counsel the drawing of new wills shortly after the reciprocal wills were executed. That various drafts of tentative wills were drawn and discussed is conceded. Not only did they consider the disposition of the property at the death of the survivor, but trusts were to be created for Betty and Herman, whereby these wards were to receive substantial monthly payments, and Herman, if he lived until he was thirty-five, would receive the corpus of the trust, which would be a rela-- tively large part of the estate in view of the monthly income that was provided. If these wills had been executed by both parties as planned, they would be in the nature of reciprocal wills, but they differed from the 1932 wills in that a substantial part of the estate left by the spouse first to die would be in trust for these two wards. We are not advised as to the reasons why Henry did not execute a new will, but there is no justification for the conclusion that such failure was due to reliance on the finality of the 1929 contracts, or any other agreement as to survivorship. On the contrary, the factual situation requires a finding that Henry, as well as Elizabeth, had frequent conferences with counsel with respect to new wills, and there is no showing that there was any suggestion during these conferences that any contract of survivorship in any way limited or restricted the parties in the disposition of their property. The trust provisions which were tentatively agreed upon dealt with substantial portions of the property and strongly negate the position that plaintiff now assumes as to the effect of the 1929 contracts. Nor is there any satisfactory showing that the parties intended that the wills they contemplated were to be merely complementary to any survivorship contract. Rather, the situation impels the view that the various contracts and wills and schemes for holding the property as between them were all subject to change and ambulatory. These parties commenced with the plan of holding jointly all the property, real and personal. Apparently, this plan was in effect and considered appropriate when the 1929 contracts were executed. Later, in 1932, when Elizabeth's mother died, they decided to divide most of their joint property, and thereupon did so. Elizabeth relinquished her half interest in certain bonds and they were placed in Henry's individual safety deposit box. Henry also relinquished his half interest to certain bonds and they were placed in a private box under the control of Elizabeth. This understanding and the actual consummation of holding most of their property in severalty are clearly reflected in Exhibit F, which was prepared by counsel and signed by the plaintiff. The amount thus divided and held in severalty by the spouses aggregated substantial amounts in bonds. While the parties did retain some real estate and bonds in joint ownership, the division of a substantial amount of bonds

in 1932 is persuasive that the joint owner- ship understanding as to all of their prop- erty was discarded. This division is con- sistent with the abandonment of a survivor- ship understanding.

It was in October, 1932, when Elizabeth made her new will. The execution of this will was undoubtedly the outgrowth of the conference she and Henry had with counsel earlier in 1932. The will, with the codicil of 1935, cannot be reconciled with any limi- tation or any restriction of disposition which plaintiff now seeks to impress upon the rights of the parties with respect to their property by reason of the 1929 con- tracts, or otherwise. Certainly, Elizabeth felt free to dispose of her property by will without any contractual limitation. When Henry first knew of the execution of this will and its codicil does not appear, but the circumstances do indicate that he knew of it some time before July, 1937, when Elizabeth's last will was executed. It further appears that he was anxious that Elizabeth should execute a new will, and was not only present when the 1937 will was executed, but arranged for its draft- ing and execution. His agreement with Herman regarding the settlement of the lawsuit which Herman had brought can leave no doubt but that Henry recognized that his wife, Elizabeth, could legally make another will and leave him less than the 1937 will insured to him. It is not con- vincing to suggest that he merely recog- nized the 1937 will as complementary to a survivorship contract in so far as it per- tains to the property that he consented to take under the will. True, he could waive his rights and permit the farm and the $30,000 to go to Herman and the $5,000 to go to Betty as the will provides, but the more reasonable and plausible explana- tion is that he probated the will and ac- cepted the benefits thereunder because he knew that the parties had long ago aban- doned by mutual consent any reciprocal survivorship arrangement or understand- ing.

In passing, it may be pointed out that to suggest that the trust or trusts referred to in Elizabeth's codicil were created for the benefit of Henry, seems utterly untena- ble. Not only is the suggestion repugnant to the uncontradicted testimony as to the contents of the tentative wills which were drawn and discussed with Elizabeth and Henry, but if Henry were the beneficiary of such a trust, surely no lawyer would draw a will appointing him as trustee thereof. Furthermore, to suggest that Henry's knowledge of Elizabeth's 1933 will and his acceptance of the provisions of the 1937 will merely evidence an acquiescence or a waiver on his part to the extent only that the wills may have modified his sur- vivorship contract, seems devoid of any merit. The simple, plausible explanation, and surely one which squares with plain common sense, is that the 1929 contracts, as a survivorship arrangement, suited the parties under the then circumstances, and, as conditions changed, both parties were agreeable to relinquish whatever rights which may have inured to them under such contracts and agreements. It is entirely reasonable to assume that the obligation to Betty and Herman, at least from Eliza- beth's viewpoint, vitally entered into the decision to make different arrangements for the devolution of the property of the one first to die. It cannot be said that the division of the bonds in 1932 and the mak- ing of new wills were only appropriate means for abiding by the alleged contract of survivorship. Not only are the acts and conduct of Elizabeth incompatible with such a theory, but everything done by Henry before and after her death, up to the time of the will contest, is directly to the contrary. Any assertion by Henry which was made to the attorney for the executor of Elizabeth's will that he, Henry, had certain contract rights to Elizabeth's property, cannot overcome the strong and impelling evidence of abandonment of any such rights by mutual consent.

True, where there is a valid survivorship contract, a will may be drawn which is complementary thereto. Admit- tedly, a will may not avoid contractual ob- ligations which have been assumed by the testator. Stewart v. Todd, supra. But, on the other hand, it is well recognized that reciprocal wills may be revoked upon notice to the other party. Anderson v. Anderson, 181 Iowa 578, 164 N.W. 1042. Plaintiff herein was admittedly advised of the rev- ocation of the 1932 reciprocal will long before the 1937 will was executed. Pre- sumably, one may probate a will and assist in the administration of the estate there- under and nevertheless assert rights under a contract of survivorship made by the testator. This was recognized in Stewart v. Todd, supra. However, the facts here- in are to be differed from those which were before the court in the case just referred

to. Here, plaintiff not only arranged for the probating of the will, but he procured the scrivener who drew the will and made all the arrangements for its execution. Plaintiff was at all times aware that Elizabeth's 1937 will was inharmonious and inconsistent with any rights which he may have had in any former survivorship contract. He was not merely performing a perfunctory statutory duty in presenting Elizabeth's will for probate. On the contrary, he was perfecting the administration of an estate under a will, the execution of which he had encouraged and arranged. The mere fact that the defendants herein were not prejudiced by his active participation in the probating of the will is not important. It is not suggested that estoppel has been shown. It is not necessary that a contract of survivorship be abandoned by formal writing. It is well recognized that a written contract may be abandoned by conduct as effectively as by words or written agreement. Monte Vista Farmers' Produce Co. v. Bemis Bro. Bag Co., 8 Cir., 294 F. 8; Morse v. Slocum, 192 Iowa 1080, 186 N.W. 22.

Summarizing, therefore, the views hereinbefore expressed, it may be stated that the election to take under the will cannot be characterized as any course of conduct except one which is inconsistent and incompatible with the position that plaintiff now assumes. The only reasonable hypothesis to deduce from the entire factual picture in this regard, and in light of the other facts and circumstances, is that plaintiff and his wife, Elizabeth, intentionally relinquished and abandoned any rights which resulted to them under the 1929 writings and attendant agreements pertaining to rights of survivorship. The bill of complaint herein must therefore be dismissed.

In view of the foregoing, it is not necessary to discuss any alleged variance between the bill of complaint and the present position of plaintiff, or the alleged failure of jurisdiction of this Court under Section 57 of the Judicial Code to entertain the character of equitable relief which is sought herein as against these non-residents.

Findings of fact and conclusions of law in harmony herewith may be presented by counsel for the defendants upon five days' notice.

An exception is reserved to the plaintiff.